**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BANK OF AMERICA, N.A.,             ) | |
|            ) | |
|          Plaintiff,      ) | |
|            ) | |
|         v.           ) | Case No. 09 C 4963 |
|            ) | |
| SHELBOURNE DEVELOPMENT GROUP, INC.  ) | |
| and GARRETT KELLEHER,      ) | |
|            ) | |
|         Defendant.    ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff/Counter-Defendant, Bank of America, N.A. ("BOA"), has filed a motion

("Motion") to (1) dismiss Defendants/Counter-Plaintiffs Shelbourne Development Group, Inc.

("Shelbourne") and Garrett Kelleher's counterclaims and (2) strike their affirmative defenses.

For the following reasons, the Court grants in part and denies in part BOA's Motion.

### LEGAL STANDARDS

**I.      Rule 12(b)(6) Motions to Dismiss**

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a

claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago*

*Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  Pursuant to Rule 8, a complaint must include "a

short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ.

P. 8(a)(2).  As the Seventh Circuit recently explained, this "[r]ule reflects a liberal notice

pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on

technicalities that might keep plaintiffs out of court."  *Brooks v. Ross*, 578 F.3d 574, 580 (7th

Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992 (2002)).

The short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957)); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).

Under the federal notice-pleading standard, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570); *see also Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) (amount of factual allegations required to state a plausible claim for relief depends on complexity of legal theory); *Reger Dev.*, 592 F.3d at 763-64. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197 (2007); *London v. RBS Citizens*, 600 F.3d 742, 745 (7th Cir. 2010) (court construes complaint in light most favorable to plaintiff, drawing all reasonable inferences in plaintiff's favor). Further, in deciding motions to dismiss, courts can consider exhibits that are attached to the complaint. *See Reger Dev.*, 592 F.3d at 764; *Miller v. Herman*, 600 F.3d 726, 733 (7th Cir. 2010).

## II.     Rule 12(f) Motions to Strike

Rule 12(f) governs motions to strike. Pursuant to that Rule, the Court can strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). "Affirmative defenses will be stricken 'only when they are insufficient on the face of

the pleadings.'" *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991) (quoting

*Heller Fin. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989)). "Motions to strike

are 'not favored and will not be granted unless it appears to a certainty that plaintiffs would

succeed despite any state of the facts which could be proved in support of the defense.'" *Id.* Yet,

"[i]t is appropriate for the court to strike affirmative defenses that add unnecessary clutter to a

case." *Davis v. Elite Mortgage Servs.*, 592 F. Supp. 2d 1052, 1058 (N.D. Ill. 2009) (citing

*Heller*, 883 F.2d at 1295). "It is also true that because affirmative defenses are subject to the

pleading requirements of the Federal Rules of Civil Procedure, they must set forth a 'short and

plain statement' of all the material elements of the defense asserted; bare legal conclusions are

not sufficient." *Id.* (citing *Heller*, 883 F.2d at 1294; Fed. R. Civ. P. 8(a); *Renalds v. S.R.G. Rest.

Group*, 119 F. Supp. 2d 800, 802 (N.D. Ill. 2000)).

Courts in this Circuit apply a three-part test to affirmative defenses that are targeted by a

motion to strike:

> (1) the matter must be properly pleaded as an affirmative defense; (2) the matter
> must be adequately pleaded under the requirements of Federal Rules of Civil
> Procedure 8 and 9; and (3) the matter must withstand a Rule 12(b)(6) challenge --
> in other words, if it is impossible for defendants to prove a set of facts in support
> of the affirmative defense that would defeat the complaint, the matter must be
> stricken as legally insufficient.

*Davis*, 592 F. Supp. 2d at 1058 (citing *Heller*, 883 F.2d at 1294). Regarding the first part of the

test, "the basic concept of an affirmative defense is an *admission* of the facts alleged in the

complaint, coupled with the assertion of some other reason defendant is not liable." *ADM

Investor Servs., Inc. v. Collins*, No. 05 C 1823, 2006 WL 224095, at *2 (N.D. Ill. Jan. 26, 2006)

(quoting *Instituto Nacional de Comercialization Agricola v. Cont'l Ill. Nat'l Bank and Trust Co.*,

576 F. Supp. 985, 988 (N.D. Ill. 1983)) (emphasis in original). Federal Rule of Civil Procedure

8 also contains a list of affirmative defenses that a Defendant may plead.  Fed. R. Civ. P. 8(c)(1).

## FACTUAL BACKGROUND

The parties executed a series of loan documents in connection with Shelbourne's plans to develop the "Spire Building" in Chicago.  As alleged in Defendants' Answer, Affirmative Defenses, and Counterclaims, Shelbourne and BOA entered into a December 11, 2006, Loan Agreement providing for a $3 million revolving credit line.  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 1; R. 46, Ex. A, Loan Agreement.)   That Loan Agreement: (1) states that "Borrower agrees to pay interest at the BBA LIBOR plus one percent (1.00%) per annum (the 'BBA LIBOR Rate') for this Facility during interest periods as selected by Borrower under Section 2.2(a) hereof and as agreed to by the Bank and the Borrower" (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 6; R. 46, Ex. A, Loan Agreement at § 1.4(a)), (2) defines the "BBA LIBOR" rate as a "fluctuating rate of interest equal to the rate per annum equal to the British Bankers Association LIBOR Rate" (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 6; R. 46, Ex. A, Loan Agreement at § 2.2(c)), and (3) provides that "[e]xcept as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed" (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 7; R. 46, Ex. A, Loan Agreement at § 5.5).

The Note, which the parties attached as Exhibit A to the Loan Agreement, provides that "Borrower shall pay interest only on the outstanding principal balance at the BBA Libor Rate, as defined in and as provided in the Loan Agreement."  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶¶ 2, 8; R. 46, Ex A., Note at 19.)  The Note also provides that "Borrower shall pay accrued interest computed as set forth in Section 2 of the Loan Agreement on the basis of the

actual days elapsed over a 360-day year."  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 10; R. 46, Ex. A, Note at 19.)  Kelleher signed a document entitled "CONTINUING AND UNCONDITIONAL GUARANTY" ("Guaranty"), which the parties attached as Exhibit B to the Loan Agreement and which identified Shelbourne as the borrower.  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 3; R. 46, Ex. A, Guaranty.)

On or around January 7, 2007, Shelbourne and BOA entered into an amendment ("Amendment No. 1") to the Loan Agreement, in which BOA agreed to loan $7 million to Shelbourne.  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 4; R. 46, Ex. C, Amendment No. 1.)  The Term Note, which the parties attached to Amendment No. 1 as Exhibit A, provides that "Borrower shall pay interest only on the outstanding principal balance at the BBA LIBOR Rate, as defined in and as provided in the Loan Agreement."  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶¶ 5, 9; R. 46, Ex. C, Term Note at 6.)  The Term Note also provides that "Borrower shall pay accrued interest computed as set forth in Section 2 of the Loan Agreement on the basis of the actual days elapsed over a 360-day year."  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 10; R. 46, Ex. C, Term Note at 6.)

On or around November 3, 2008, Shelbourne and BOA entered into an amendment ("Amendment No. 2") to the Loan Agreement, which provided:

> To evidence the availability to [Shelbourne] of a facility for purposes of financing its development and construction of the Spire Building, [Shelbourne] shall obtain from a lender or syndicate of lenders, no later than November 1, 2008, a binding irrevocable construction loan commitment, and provided further, when delivered, such loan commitment shall be in form and substance acceptable to [BOA].

(R. 53, Defs.' Answer at ¶ 6; R. 46, Ex. E, Amendment No. 2 at § 2.1.)  Shelbourne did not obtain a construction loan commitment by November 1, 2008.  (R. 53, Defs.' Answer at ¶ 7.)

BOA has accordingly stated that it is entitled to accelerate all amounts due under the Loan Agreement and demanded full payment. (*Id.* at ¶ 9.)

## ANALYSIS

Shelbourne[1] alleges that BOA acted deceptively by using a 360-day year to calculate interest despite allegedly-conflicting provisions mandating the use of a per annum interest rate. (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶¶ 11-15.) Based on this alleged conduct, Defendant raises three affirmative defenses: (1) breach of the duty of good faith and fair dealing, (2) breach of the Illinois Interest Act ("IIA"), and (3) commercial impracticability. Further, Defendant brings counterclaims alleging that BOA (1) violated the IIA (Count I), (2) breached the parties' contract and the duty of good faith and fair dealing (Count II), (3) violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (Count III), and (4) committed common law fraud (Count IV).

At the heart of this litigation is a dispute between the parties regarding how interest should have been calculated under the loan documents. As the Seventh Circuit teaches:

> Because the Gregorian calendar makes it impossible to have both equal daily interest charges and equal monthly interest charges throughout the year, banks have developed three methods of computing interest. These are the 365/365 method (exact day interest), the 360/360 method (ordinary interest) and the 365/360 method (bank interest). Under the 365/365 method each day has the same interest charge; the bank simply divides the annual interest rate by 365 to get a daily interest factor, applied to each day of the year. Under the 360/360 method each month carries the same interest charge; every completed month is assumed to have thirty days, and accumulates one-twelfth of the annual interest. Interest for incomplete months is calculated by dividing the number of days by 360. At the end of a year both of these methods produce the same interest because in each case the calculation will be Principal x Rate x 1. The 365/360

---

[1] Unless otherwise noted, the Court hereafter collectively refers to Defendants/Counter-Plaintiffs as "Shelbourne."

method is a hybrid. Here the bank first divides the annual interest rate by 360 to produce a daily interest factor. It then applies that factor to each of the 365 or 366 days in the year, even though the borrower has paid the nominal "annual" interest due after 360 days. Thus this method generates five or six extra days of interest for the bank each year, increasing the effective interest rate for the calendar year by 1/72.

*In re Oil Spill by Amoco Cadiz Off Coast of Fr. on Mar. 16, 1978*, No. 92-3282, 1993 WL 360955, at *1-2 (7th Cir. Sept. 14, 1993) (internal citations omitted and noting at *4 that "the 365/360 method, though not universal, is apparently the prevailing method in commercial loans").

## I.     The National Bank Act and Preemption

BOA argues that the National Bank Act ("NBA") preempts all of Shelbourne's counterclaims and affirmative defenses. "Congress has the authority, in exercising its Article I powers, to pre-empt state law." *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 109 S. Ct. 1661, 1665 (1989). "The constitutional basis for federal preemption is found in the Supremacy Clause (Article VI, Clause 2 of the U.S. Constitution), which states, '[T]he laws of the United States . . . shall be the supreme Law of the Land.'" *Mason v. Smithkline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010).

As the Supreme Court has stated, "'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Wyeth v. Levine*, – U.S. –, 129 S. Ct. 1187, 1194 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240 (1996)); *Barnett Bank of Marion Co., N.A. v. Nelson*, 517 U.S. 25, 30, 116 S. Ct. 1103, 1107 (1996) ("This [preemption] question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law."). Further, "in all pre-

emption cases, . . . [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth*, 129 S. Ct. at 1194-95 (quoting *Medtronic*, 518 U.S. at 485, 116 S. Ct. 2240). This presumption against preemption follows from courts' recognition of "States as 'independent sovereigns in our federal system'" and the related assumption "that 'Congress does not cavalierly pre-empt state-law causes of action.'" *Id.* at 1195 n.3 (quoting *Medtronic*, 518 U.S. at 485, 116 S. Ct. 2240).

Preemption, "which occurs when a state law is invalidated because it conflicts with a federal law," *id.*, comes in three forms: "express preemption, field preemption, and conflict preemption" *Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008).

> "Express preemption occurs when a federal statute explicitly states that it overrides state or local law." As for field preemption, it exists "when federal law so thoroughly occupies a legislative field as to make it reasonable to infer that Congress left no room for the states to act." . . . [C]onflict preemption . . . "exists if it would be impossible for a party to comply with both local and federal requirements or where local law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* (quoting *Hoagland v. Town of Clear Lake*, 415 F.3d 693, 696 (7th Cir. 2005), with internal citations omitted); *see also Mason*, 596 F.3d at 390; *United States v. Locke*, 529 U.S. 89, 109, 120 S. Ct. 1135, 1148 (2000). Regarding conflict preemption, "'the crucial inquiry is whether state law differs from federal law in such a way that achievement of the congressional objective . . . is frustrated.'" *Aux Sable*, 526 F.3d at 1034 (quoting *Frank Bros. v. Wis. Dep't of Transp.*, 409 F.3d 880, 894 (7th Cir. 2005)). "To determine whether state and federal law are in conflict, it is necessary to 'examine the federal statute as a whole and identify its purpose and intended effects.'" *Aux Sable*, 526 F.3d at 1034 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530

U.S. 363, 373, 120 S. Ct. 2288 (2000)).  "The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute."  *Rice v. Norman Williams Co.*, 458 U.S. 654, 102 S. Ct. 3294, 3299 (1982).

The NBA completely preempts state usury laws.  *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11, 123 S. Ct. 2058, 2064 (2003) (finding that "there is, in short, no such thing as a state-law claim of usury against a national bank"); *In re Repository Techs., Inc.*, 601 F.3d 710, 723 (7th Cir. 2010); *City of Chicago v. Comcast Cable Holdings, L.L.C.*, 384 F.3d 901, 905 (7th Cir. 2004) (noting that the NBA "knocks out all state regulation of national banks' interest charges, so that any claim must rest on federal law alone").  "The United States has set up a system of national banks as federal instrumentalities to perform various functions such as providing circulating medium and government credit, as well as financing commerce and acting as private depositories."  *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 375, 74 S. Ct. 550, 552 (1954).  Since Congress enacted the NBA in 1864, the Supreme Court has "repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11, 127 S. Ct. 1559, 1566-67 (2007); *see also Beneficial Nat'l Bank*, 539 U.S. at 10, 123 S. Ct. at 2064 ("In addition to this Court's longstanding and consistent construction of the National Bank Act as providing an exclusive federal cause of action for usury against national banks, this Court has also recognized the special nature of federally chartered banks.  Uniform rules limiting the liability of national banks and prescribing exclusive remedies for their overcharges are an integral part of a banking system that needed protection from 'possibly unfriendly State legislation.'" (quoting *Tiffany v. Nat'l Bank of Mo.*, 18 Wall. 409, 412 (1874))).  Accordingly, it

is "[b]eyond genuine dispute" that state law "may not curtail or hinder a national bank's efficient exercise of [its real-estate-lending power or] any other power, incidental or enumerated under the NBA." *Id.* at 13, 127 S. Ct. at 1567-68.

The NBA "plainly provides that a national bank may charge interest 'on any loan' at the rate allowed by the laws of the State in which the bank is 'located.'"[2] *Id.* As the Supreme Court stated in *Beneficial Nat'l Bank*:

> Sections 85 and 86 serve distinct purposes. The former sets forth the substantive limits on the rates of interest that national banks may charge. The latter sets forth the elements of a usury claim against a national bank, provides for a 2-year statute of limitations for such a claim, and prescribes the remedies available to borrowers who are charged higher rates and the procedures governing such a claim.

539 U.S. at 9, 123 S. Ct. at 2063. The reasoning behind this rule is straightforward:

> If the location of the bank were to depend on the whereabouts of each . . . transaction, the meaning of the term "located" would be so stretched as to throw into confusion the complex system of modern interstate banking. A national bank could never be certain whether its contacts with residents of foreign States were sufficient to alter its location for purposes of § 85.

*Id.* at 312, 99 S. Ct. at 547.

### A.     Illinois Interest Act

The NBA preempts Shelbourne's IIA affirmative defense and counterclaim. Shelbourne does not dispute that the NBA preempts state-law-usury claims. It contends, rather, that it has not alleged that the interest charged by BOA is usurious. That argument does not survive a

---

[2] A national bank is "located" in the state that the bank's organization certificate specifies. *See Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 308, 99 S. Ct. 540, 545 (1978). Shelbourne does not allege where BOA is "located" for NBA purposes, and it purportedly lacked sufficient knowledge to admit or deny BOA's allegation that BOA is located in North Carolina. Further, Shelbourne makes no allegation regarding the legality of BOA's interest calculation under North Carolina law.

review of Shelbourne's allegations.

Black's Law Dictionary defines usury as "the charging of an illegal rate of interest" or "[a]n illegally high rate of interest." Black's Law Dictionary (8th ed. 2004); *see also Budnik v. Bank of Am. Mortgage*, No. 03 C 6116, 2003 WL 22964372, at *3 (N.D. Ill. Dec. 16, 2003) ("'Usury is the receiving, securing, or taking of a greater sum or value for the loan or forbearance of money, goods, or things in action than is allowed by law, the exaction of a greater sum for the use of money than the highest rate of interest allowed by law.'" (quoting 45 Laura Dietz & Anne M. Payne, Am. Jur., Interest & Usury § 2 (2d ed. 2002))); *General Motors Acceptance Corp. v. Kettleson*, 219 Ill. App. 3d 871, 874, 580 N.E.2d 187, 189 (Ill. App. Ct. 1991) ("Usury is defined as an illegal profit received by the lender on a sum of money loaned to a borrower."); *Tyrcha v. Wesolek*, 187 Ill. App. 3d 354, 357, 543 N.E.2d 222, 224 (Ill. App. Ct. 1989) ("Usury is an illegal profit required and received by a lender of a sum of money from the borrower." (citing *Clemens v. Crane*, 234 Ill 215, 229-30, 84 N.E. 884, 889 (Ill. 1908))).

Charging an illegal – and therefore usurious – rate of interest is exactly what Shelbourne alleges that BOA did. Shelbourne, for example, (1) alleges that BOA received "greater value for the loan under the Note and Term Note *than authorized by the Illinois Interest Act*" (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 22 (emphasis added)); (2) quotes from IIA Section 5, which prohibits the receipt of "any greater sum or greater value for the loan . . . *than is expressly authorized by this Act*" (*id.* at ¶ 23 (emphasis added)); and (3) alleges that "Plaintiff knowingly and unlawfully applied a definition of 'year' that did not comply with the Promissory Note and Bank Holiday Act and, as a result, in violation of the Illinois Interest Act, charged and received more interest *than authorized under the Illinois Interest Act*" (*id.* at ¶ 26 (emphasis

added)).

Shelbourne's IIA affirmative defense and counterclaim accuse BOA of charging fees that exceeded those allowed by law. As such, they are based on usury and preempted by the NBA. *See Forness v. Cross Country Bank, Inc.*, No. 05-CV-417-DRH, 2006 WL 240535, at *4 (S.D. Ill. Jan. 13, 2006) (finding that the plaintiffs' complaint raised a preempted usury claim because it accused the defendants of charging excessive fees); *Patterson v. Regions Bank*, No. 06-CV-469-DRH, 2006 WL 3407852, at *5 (S.D. Ill. Nov. 27, 2006) (finding that a complaint did not raise a usury claim where there was "no indication that the challenged interest rate exceeds what is allowed by law or that the interest rate itself amounts to an excessive charge"); *Budnik*, 2003 WL 22964372, at *3 ("Regardless of the [plaintiffs'] characterization of the unearned interest, they are in fact attacking the overall amount of interest charged by Bank of America Mortgage. As the saying goes, if it walks like a duck and quacks like a duck, it must be a duck."); *Treadway v. Nations Credit Fin. Servs. Corp.*, 383 Ill. App. 3d 1124, 1130, 892 N.E.2d 534, 539 (Ill. App. Ct. 2008) (a complaint did not raise a usury claim in the absence of an allegation that the defendant charged the plaintiff "interest that exceeded any limit imposed by any state or federal lending statute or regulation"); *Dannewitz v. Equicredit Corp. of Am.*, 362 Ill. App. 3d 82, 87, 839 N.E.2d 1060, 1064 (Ill. App. Ct. 2005). The Court, therefore, strikes Shelbourne's second affirmative defense and first counterclaim. *See Phipps v. Fed. Deposit Ins. Corp.*, 417 F.3d 1006, 1013 (8th Cir. 2005) ("Once the district court determined the plaintiffs' claims are preempted, it was a short step to conclude these claims must be dismissed.").

**B.      Remaining Counterclaims and Affirmative Defenses**

BOA argues that the NBA preempts the remaining counterclaims and affirmative defenses because they essentially – albeit not explicitly – allege usury.  Specifically, BOA argues that the other claims "are each premised on the notion that Bank of America bargained for a contract that included an interest calculation provision that resulted in Bank of America receiving more interest than is purportedly allowed under Illinois law."  (R. 26, Pl.'s Mem. in Supp. of Mot. to Dismiss & Strike at 9-10.)  Shelbourne responds that the NBA does not preempt its counterclaims and affirmative defenses because they "are directed to a lender's improper and deceptive method of computing interest" and therefore not for usury.  (R. 62, Resp. Br. at 9.)

The NBA does not preempt any of BOA's other affirmative defenses or counterclaims.  While the NBA preempts claims for usury, as more thoroughly explained below none of the remaining affirmative defenses or counterclaims is based upon BOA's charging an illegal interest rate.  They are premised, rather, on allegations that (1) BOA charged interest in a manner that conflicted with its representations or (2) Shelbourne was unable to perform under the loan documents due to an "unforeseeable and unprecedented economic downturn and recession."  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶¶ 19, 31, 48, 56, 59-60, 65.)  Accordingly, the NBA does not preempt them.  *Patterson*, 2006 WL 3407852, at *5 (finding that a complaint did not raise a usury claim where it alleged that the defendant was "not charging the rate it said it would charge").

**II.      Illinois Interest Act Counterclaim and Affirmative Defense**

Beyond being preempted by the NBA, Defendant's IIA counterclaim and affirmative defense fail because the IAA (1) does not apply to a corporation's loans and (2) merely provides

a gap-filling mechanism where – unlike here – no period of time is stated for which interest is to be calculated. Shelbourne alleges that BOA violated the IIA by (1) "receiv[ing] by device, subterfuge, and other means a greater value for the loan under the Loan Agreement, Note and Term Note"; and (2) "using a year of less than 12 calendar months (*i.e.*, 360 days only) to compute and charge interest." (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶¶ 22-26.)

The IIA excludes from its coverage loans to corporations. Specifically, it provides that "[i]t is lawful to charge, contract for, and receive any rate or amount of interest or compensation with respect to . . . [a]ny loan made to a corporation." 815 Ill. Comp. Stat. § 205/4(1)(a). Based on this provision's plain meaning, Illinois courts have concluded that the IIA "does not apply to transactions involving corporations." *Computer Sales Corp. v. Rousonelos Farms, Inc.*, 190 Ill. App. 3d 388, 392, 546 N.E.2d 761, 763 (Ill. App. Ct. 1989); *see also Ehlers v. Frey*, 109 Ill. App. 3d 1004, 1009, 441 N.E.2d 651, 655 (Ill. App. Ct. 1982); *Jones & Brown, Inc. v. W. E. Erickson Constr. Co.*, 73 Ill. App. 3d 481, 483, 391 N.E.2d 1097, 1098 (Ill. App. Ct. 1979). As one Illinois treatise puts it, a corporation "has the power to borrow money for its corporate purposes at such rates of interest as the corporation may determine, without regard to the restrictions of any usury law of Illinois. Consequently, the usury statute does not limit the interest that a corporation may contract to pay on a transaction." 35 Kimberly C. Simmons, Ill. Law and Prac. Usury § 11 (2010). Furthermore, the IAA's corporate-loan exemption extends to loans involving a corporation's guarantor. *See Verson v. Hardt*, 107 Ill. App. 2d 480, 484, 246 N.E.2d 461, 463 (Ill. App. Ct. 1969).

Additionally, even if the IIA applied to loans to corporations and were not preempted by the NBA, it still would not apply in this case. Section 9 of the IIA clearly provides:

14

Whenever, in any statute, act, deed, written or verbal, contract, or in any public or private instrument whatever, any certain rate of interest is or shall be mentioned, _**and no period of time is stated for which such rate is to be calculated**_, interest shall be calculated at the rate mentioned, by the year, in the same manner as if "per annum" or "by the year" had been added to the rate.

815 Ill. Comp. Stat. § 205/9 (emphasis added). Under its express terms, therefore, Section 9 only applies when "no period of time is stated" in the instrument. Here, the IIA affirmative defense and counterclaim – together with the underlying loan documents – clearly provide that interest was to be calculated based on a 360-day year. (*See* R. 53, Defs.' Affirmative Defenses & Countercls. at ¶¶ 7, 10, 14, 26, 41.) Accordingly, Section 9's gap-filling mechanism does not apply, and the Court strikes Shelbourne's third affirmative defense and dismisses Count I.

## III.     Breach of Contract/Implied Duty of Good Faith and Fair Dealing Counterclaim and Affirmative Defense

Shelbourne's counterclaim and affirmative defense relating to BOA's alleged breach of contract and the implied duty of good faith and fair dealing also fail because, as alleged and as shown in the loan documents, BOA charged interest in accordance with the non-discretionary terms of the loan documents. Shelbourne alleges that Plaintiff:

(1) deliberately created ambiguity in the language of the loan documents explaining how interest would be calculated (*i.e.*, by stating that the applicable interest rates were "per annum," while also stating that interest would be based on a 360-day year) and then (2) exercised its discretion to calculate interest in a manner that charged Shelbourne and Mr. Kelleher, as purported guarantor, more interest than they reasonably expected to be charged (*i.e.*, by calculating interest using the 360-day year, notwithstanding the fact that the Loan Agreement, Note and Term Note described the applicable interest rates as "per annum").

(R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 48; *see also id.* at ¶ 19.)

BOA's argument that Shelbourne cannot bring an independent cause of action for breach of the good-faith covenant misses the mark because Shelbourne's good-faith theory is part of its

breach-of-contract claim. (*See* R. 53, Defs.' Affirmative Defenses & Countercls. at ¶¶ 43-49.)

As the Seventh Circuit teaches, "breach of the covenant of good faith and fair dealing is not an

independent cause of action under Illinois law except 'in the narrow context of cases involving

an insurer's obligation to settle with a third party who has sued the policy holder.'" *APS Sports*

*Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) (quoting *Voyles v.*

*Sandia Mortgage Corp.*, 196 Ill. 2d 288, 751 N.E.2d 1126, 1131 (Ill. 2001)). For this reason,

"courts regularly dismiss causes of action for breach of duty of good faith when they are not

asserted *within* a breach of contract claim." *Hickman v. Wells Fargo Bank N.A.*, 683 F. Supp. 2d

779, 793 (N.D. Ill. 2010) (emphasis in original and compiling cases); *see also LaSalle Bank*

*Nat'l Assoc. v. Paramont Props.*, 588 F. Supp. 2d 840, 853 (N.D. Ill. 2008). Because

Shelbourne's claim for breach of the duty of good faith is part of its breach-of-contract cause of

action, however, the Court will not dismisses Count II on these grounds.

Even taken as true, however, Shelbourne's allegations do not state a claim for breach of

contract or trigger a good faith defense or counterclaim. As alleged and as provided for in the

loan documents, BOA was merely calculating interest according to the non-discretionary terms

of the parties' agreements. Under Illinois law, "[e]very contract contains an implied promise of

good faith and fair dealing between the contracting parties," absent express disavowal.

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003); *Tatom v.*

*Ameritech Corp.*, 305 F.3d 737, 745 (7th Cir. 2002). The purpose of this implied duty is "to

ensure that parties do not take advantage of each other in a way that could not have been

contemplated at the time the contract was drafted or do anything that will destroy the other

party's right to receive the benefit of the contract." *Gore v. Ind. Ins. Co.*, 376 Ill. App. 3d 282,

286, 876 N.E.2d 156, 161 (Ill. App. Ct. 2007) (citing *Cramer v. Ins. Exch. Agency*, 174 Ill. 2d 513, 523-24, 675 N.E.2d 897, 903 (Ill. 1996)).

To establish that BOA breached the duty of good faith and fair dealing, Shelbourne must establish that "the contract vested [BOA] with discretion in performing an obligation under the contract and [BOA] exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties." *Hickman*, 683 F. Supp. 2d at 792. This implied covenant is only a rule of construction, however; it is "not a stand-alone obligation." *In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006); *see also Zeidler v. A & W Rests., Inc.*, 301 F.3d 572, 575 (7th Cir. 2002) ("The covenant is only an aid to interpretation, not a source of contractual duties or liability under Illinois law."). The implied covenant "is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document." *Hickman*, 683 F. Supp. 2d at 792 (quotation omitted). Courts use it, rather, "to determine the intent of the parties where a contract is susceptible to two conflicting constructions." *Cromeens*, 349 F.3d at 395.

When the covenant applies, it "does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper." *The Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992). It imposes a duty "not to 'be reasonable,' but to avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous." *Id.* (noting that it would be bad faith for a party to dishonestly invoke a contractual provision "to achieve a purpose contrary to that for which the contract had been made"); *see also Greer Props., Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457, 460

(7th Cir. 1989).  Additionally, the duty of good faith requires parties who have entered into a

contract to "bargain[] in good faith over terms left open by the original contract" because "that

bargaining is a component of the anticipated performance."  *First Nat'l Bank of Chicago v. Atl.

Tele-Network Co.*, 946 F.2d 516, 520 (7th Cir. 1991).

When there is no ambiguity in a contract, however, the good-faith covenant does not

come into play.  *In re Kmart*, 434 F.3d at 542.  As the Seventh Circuit has noted, "Illinois law

holds that parties to a contract are entitled to enforce the terms to the letter and an implied

covenant of good faith cannot overrule or modify the express terms of a contract."  *Cromeens*,

349 F.3d at 395-96.  The language at issue here is not ambiguous.  That language provided that

"all interest and fees, if any, will be computed on the basis of a 360-day year and the actual

number of days elapsed."  (R. 45-1, Ex. A, Loan Agreement at § 5.5; *see also* R. 46, Ex. C, Term

Note at 6.)  This provision unambiguously specifies that interest will be calculated based on a

360-day year, and the "actual number of days" language indicates that interest will be based on

the 365/360 method – not the 360/360 method – because there are 365 (or 366) days in a year,

not 360.  *See In re Mkt. Ctr. E. Retail Prop., Inc.*, – B.R. –, 2010 WL 3088550, at *11-12

(D.N.M. Aug. 3, 2010).  Further, there is no conflict between using the 365/360 method and

stating that the applicable interest rates were "per annum."  *See In re Oil Spill by Amoco Cadiz

Off Coast of Fr. on Mar. 16, 1978*, No. 92-3282, 1993 WL 360955, at *1-2 (7th Cir. Sept. 14,

1993) (describing the different methods of calculating annual interest, including the most-

common, 365/360, method).

Shelbourne alleges that BOA calculated interest using the 365/360 method, which is what

the loan documents provided for.  A party cannot invoke the covenant of good faith to target

another's non-discretionary actions under a contract. "Problems relating to good faith performance are most common where one party to an agreement is given wide discretion, and the other party must hope the discretion is exercised fairly." *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000). "The covenant requires a party vested with broad discretion to act reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties." *Cromeens*, 349 F.3d at 395; *see also Greer Props.*, 874 F.2d at 460 (noting that the "implied obligation of good faith and fair dealing in the performance of contracts acts as a limit on the discretion possessed by the parties"). To properly allege breach of the covenant, a party must plead the existence of contractual discretion. Accordingly, "the good-faith duty to exercise contractual discretion reasonably does not apply where no contractual discretion exists." *Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, 352 Ill. App. 3d 160, 165, 815 N.E.2d 911, 916 (Ill. App. Ct. 2004).

Shelbourne's breach-of-contract/breach-of-good-faith affirmative defense and counterclaim fail because Shelbourne has alleged that BOA was calculating interest based on the 365/360 method, and that is exactly what the loan documents specified that BOA do. The Counterclaim alleges, for example, that under the Loan Agreement "'all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed.'" (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 7 (quoting Loan Agreement at § 5.5).) It also alleges that under the Note and Term Note, "'Borrower shall pay accrued interest computed as set forth in Section 2 of the Loan Agreement on the basis of the actual days elapsed over a 360-day year.'" (*Id.* at ¶ 10.) Because BOA did not exercise any discretion in calculating interest based on a 360-day year, it "cannot be held to have breached the covenant of good faith and fair

dealing for simply enforcing the contracts as written." *Cromeens*, 349 F.3d at 396; *see also*

*McDonald's Corp. v. C.B. Mgmt. Co.*, 13 F. Supp. 2d 705, 711 (N.D. Ill. 1998); *Gore*, 376 Ill.

App. 3d at 287, 876 N.E.2d at 162; *Northern Trust Co. v. VIII S. Mich. Assocs.*, 276 Ill. App. 3d

355, 367, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995).

## IV.    Illinois Consumer Fraud Act Counterclaim

In Count III, Defendants allege that Plaintiff violated the ICFA by:

- "engag[ing] in a deceptive, unfair, systematic, and common practice of computing and charging interest at an interest rate with a 'per annum' time period added to the rate, but computing and charging that interest using only a 'year' containing 360 days, thereby overcharging defendants" (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 56);

- "willfully and wantonly engag[ing] in an ongoing systematic pattern and common practice of deception and unfairness" that included "misrepresentations, half-truths, and omissions concerning the Loan Agreement, Note and Term Note in order to conceal the true rate of interest to be applied and the increased cost of credit, and thereby to increase surreptitiously Plaintiff's profits at the expense of Defendants" (*id.* at ¶ 57);

- "lur[ing] Shelbourne into contracting with Plaintiff, and entering into the Loan Agreement, Note and Term Note unilaterally drafted by Plaintiff, by means of false promises to prepare the Loan Agreement, Note and Term Note to document accurately the negotiated and agreed terms of credit (including *per annum* interest rates), all the while intending to insert in the Loan Agreement, Note and Term Note inconspicuous, confusing, vague and contradictory boilerplate language to conceal and create confusion over the actual interest rate and the cost of credit to Shelbourne" (*id.* at ¶ 59 (emphasis in original)); and

- "increas[ing] the daily interest rate and cost of the loan to Shelbourne, and by extension, the financial exposure of Mr. Kelleher, as purported guarantor, by using less than 12 calendar months to compute the daily interest charge and then charging this daily interest for 12 calendar months of 365 or 366 days" (*id.* at ¶ 60).

The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers,

and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417, 775 N.E.2d 951, 960 (Ill. 2002); *see also Rockford Mem'l Hosp. v. Havrilesko*, 368 Ill. App. 3d 115, 121, 858 N.E.2d 56, 61 (Ill. App. Ct. 2006). "It eliminated many of the common-law fraud elements, creating a new cause of action that affords consumers broad protection." *Havrilesko*, 368 Ill. App. 3d at 121, 858 N.E.2d at 61; *see also Miller v. William Chevrolet/Geo, Inc.*, 326 Ill. App. 3d 642, 654-55, 762 N.E.2d 1, 11 (Ill. App. Ct. 2001) ("The Act offers 'a clear mandate to the Illinois courts to utilize the Act to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief to consumers.'" (quoting *Totz v. Cont'l DuPage Acura*, 236 Ill. App. 3d 891, 901, 602 N.E.2d 1374, 1380 (Ill. App. Ct. 1992))). "It is to be liberally construed to effect its purposes." *Havrilesko*, 368 Ill. App. 3d at 121, 858 N.E.2d at 61; *see also Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1996).

To prevail on an ICFA claim, a plaintiff must prove: "(1) a deceptive act or practice by [the defendant]; (2) that the act or practice occurred in the course of conduct involving trade or commerce; (3) that [the defendant] intended [the plaintiff] to rely on the deception; and (4) that actual damages were proximately caused by the deception." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (citing *Avery v. State Farm Mut. Auto Ins. Co.*, 216 Ill. 2d 100, 835 N.E.2d 801, 850 (Ill. 2005); *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 776 N.E.2d 151, 164 (Ill. 2002)); *see also Siegel v. Shell Oil Co.*, – F.3d –, No. 09-3451, 2010 WL 2977315, at *2 (7th Cir. July 30, 2010); *Demitro v. General Motors Acceptance Corp.*, 388 Ill. App. 3d 15, 19, 902 N.E.2d 1163, 1168 (Ill. App. Ct. 2009). To determine if a practice is unfair under the ICFA, courts ask whether it (1) violates public policy, (2) is so oppressive that the consumer has little

choice but to submit, and (3) causes consumers substantial injury. *See Siegel*, 2010 WL 2977315, at *2 (noting that under the third prong, an injury generally must: "(1) be substantial; (2) not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) be an injury that consumers themselves could not reasonably have avoided"). A practice may be unfair under the ICFA even if it does not satisfy all of these criteria. *See id.*

Shelbourne cannot state an ICFA claim based on terms that are revealed within the very loan documents that it signed. As the Seventh Circuit has stated, "[a] 'party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 767 (7th Cir. 2010) (quoting *VIII S. Mich.*, 276 Ill. App. 3d at 365-66, 657 N.E.2d at 1103); *see also Belleville Nat'l Bank v. Rose*, 119 Ill. App. 3d 56, 59, 456 N.E.2d 281, 284 (Ill. App. Ct. 1983) ("One is under a duty to learn, or know, the contents of a written contract before he signs it, and is under a duty to determine the obligations which he undertakes by the execution of a written agreement." (quotation omitted)). "The application of this rule is particularly appropriate where the parties to the agreement are sophisticated business persons." *VIII S. Mich.*, 276 Ill. App. 3d at 365-66, 657 N.E.2d at 1103. As discussed above, Shelbourne has alleged – and the loan documents confirm – that BOA was to calculate interest based on the 365/360 method. (*See* R. 53, Defs.' Affirmative Defenses & Countercls. at ¶¶ 7, 10.) That is exactly what Shelbourne has alleged that BOA did. (*Id.*) As such, the ICFA claim fails.[3]

---

[3] BOA is correct that, generally speaking, actions brought under the ICFA are subject to Rule 9(b)'s heightened pleading requirements because they involve averments of fraud. *See Duggan v. Terzakis*, 275 F. Supp. 2d 968, 973 (N.D. Ill. 2003) (noting that courts must "evaluate

## V.    Common Law Fraud Counterclaim

"To state a fraud claim under Illinois law, a plaintiff must allege that the defendant: (i) made a false statement of material fact; (ii) knew or believed the statement to be false; (iii) intended to and, in fact, did induce the plaintiff to reasonably rely and act on the statement; and (iv) caused injury to the plaintiff."  *Reger Dev.*, 592 F.3d at 766; *see also Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009).  As explained above, Shelbourne has alleged that BOA calculated interest by using the 365/360 method, which is exactly the method called for by the loan documents.  Without a false statement, Shelbourne's fraud claim must be dismissed.

## VI.    Commercial Impracticability Affirmative Defense

In their commercial-impracticability affirmative defense, Shelbourne alleges that its inability to perform is "(1) temporary, and (2) the result of an unforeseeable and unprecedented economic downturn and recession, particularly in the real estate market."  (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 31.)  Shelbourne further alleges that "Plaintiff's own executives and officers have repeatedly made public statements and other communications describing the current economic conditions, including those affecting the real estate market and the availability of credit, as 'unprecedented,' 'unparalleled' and not reasonably foreseeable."  (*Id.* at ¶ 33.)  BOA argues that this affirmative defense is unavailable to Shelbourne because the

---

Rule 9(b)'s particularity requirement in light of the purposes of: (1) protecting defendants' reputations from harm, (2) minimizing strike suits and fishing expeditions, and (3) providing defendants with adequate notice" (internal quotations omitted)); *Neff v. Capital Acquisitions & Mgmt. Co.*, 238 F. Supp. 2d 986, 994 (N.D. Ill. 2002); *but see Strohmaier v. Yemm Chevrolet*, 211 F. Supp. 2d 1036, 1043 (N.D. Ill. 2001) (Rule 9(b) does not apply to ICFA claims that are not based on fraudulent acts).  Because Shelbourne did not state an ICFA claim, however, the Court need not address BOA's Rule 9(b) argument.

parties both foresaw and expressly provided for the possibility that Shelbourne would be unable to obtain financing. (*See* R. 26, Pl.'s Mem. in Supp. of Mot. to Dismiss & Strike at 18-19 (citing Amendment No. 1 at § 2.3, Amendment No. 2 at § 2.1).)

A party raising an impossibility defense must show: (1) an unanticipated circumstance, (2) that was not foreseeable, (3) to which the other party did not contribute, and (4) to which the party raising the defense has tried all practical alternatives. *See Blue Cross Blue Shield of Tenn. v. BCS Ins. Co.*, 517 F. Supp. 2d 1050, 1056 (N.D. Ill. 2007); *Illinois-Am. Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1106, 774 N.E.2d 383, 391 (Ill. App. Ct. 2002). "The rationale for the defense of commercial impracticability is that the circumstance causing the breach has rendered performance so vitally different from what was anticipated that the contract cannot be reasonably thought to govern." *Waldinger Corp. v. CRS Group Eng'rs, Inc.*, 775 F.2d 781, 786 (7th Cir. 1985) (internal quotation omitted). This defense, "like the doctrine of good faith, is a gap filler; it must not be used to alter an agreed upon allocation of risk. Parties to contracts know better than a court does what allocation of risk is best for them." *Tele-Network*, 946 F.2d at 521.

The viability of this affirmative defense depends on whether the economic downturn was foreseeable. "Because the purpose of a contract is to place the reasonable risk of performance upon the promisor, . . . it is presumed to have agreed to bear any loss occasioned by an event that was foreseeable at the time of contracting." *Waldinger*, 775 F.2d at 786. The foreseeability inquiry is "whether the risk of the occurrence of the contingency was so unusual or unforeseen and the consequences of the occurrence . . . so severe that to require performance is to grant the buyer an advantage he did not bargain for in the contract." *Id.* Whether a party's contractual

performance is impossible depends on what its obligations were. *See Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 727 (7th Cir. 2009). "If the risk of the occurrence of the contingency was unforeseeable, the seller cannot be said to have assumed that risk." *Waldinger*, 775 F.2d at 786. If a contingency is foreseeable, however, the commercial-impracticability defense is not available "because the party disadvantaged by the fruition of the contingency might have contractually protected itself." *Id.* As one court has noted:

> It is difficult to establish unforeseeability because the general rule is that "where parties, by their own contract and positive undertaking, create a duty or charge upon themselves, they must abide by the contract and make the promise good, and subsequent contingencies, not provided against in the contract which render performance impossible, do not bring the contract to an end."

*Blue Cross*, 517 F. Supp. 2d at 1057 (quoting *Joseph W. O'Brien Co. v. Highland Lake Constr. Co.*, 17 Ill. App. 3d 237, 241, 307 N.E.2d 761, 765 (Ill. App. Ct. 1974)).

Based on the allegations in Shelbourne's third affirmative defense, whether the economic downturn was foreseeable cannot be resolved on a motion to strike. The fact that performance becomes economically burdensome generally does not excuse performance. *See Greer Props.*, 874 F.2d at 460; *United States v. S.W. Elec. Coop., Inc.*, 869 F.2d 310, 316 (7th Cir. 1989). If the parties could not have foreseen the extent of the economic downturn, however, and if performance were impossible, Shelbourne could satisfy the requirements for an impracticability defense. *See Hoosier Energy*, 582 F.3d at 729 (summarizing uniform commercial-impracticability principles and applying New York law). While many could have foreseen the economic downturn, *see Ner Tamid Congregation of N. Town v. Krivoruchko*, 638 F. Supp. 2d 913 (N.D. Ill. 2009), here Shelbourne has alleged that BOA itself "has acknowledged that the

economic conditions, including those affecting the availability of credit, are unprecedented and not reasonably foreseeable." (R. 53, Defs.' Affirmative Defenses & Countercls. at ¶ 32.) Specifically, BOA's own executives and officers allegedly "have repeatedly made public statements and other communications describing the current economic conditions, including those affecting the real estate market and the availability of credit, as 'unprecedented,' 'unparalleled' and not reasonably foreseeable." (*Id.* at ¶ 33.) Based on these allegations, it is "uncertain whether the extent of the 2008 credit crunch, which extended into 2009, was foreseeable" to the parties at the time that they entered into the loan documents. *Hoosier Energy*, 582 F.3d at 729. BOA has not shown to a certainty that it would succeed on this affirmative defense, and therefore its motion to strike it must be denied. *See Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991).

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Plaintiff/Counter-Defendant BOA's motion to dismiss and strike.

Dated: August 18, 2010                         ENTERED:


_____
AMY J. ST. EVE
United States District Court Judge